## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 13 2016, 6:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jerry T. Drook
Marion, Indiana

ATTORNEY FOR APPELLEE

William T. Myers
Marion, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Guardianship of L.B.:

Sarah Craft,

*Appellant-Respondent,*

v.

Hollie Worthington,

*Appellee-Petitioner*

September 13, 2016

Court of Appeals Case No. 27A02-1602-GU-388

Appeal from the Grant Superior Court

The Honorable Dana J. Kenworthy, Judge

Trial Court Cause No. 27D02-1601-GU-1

**Baker, Judge.**

Sarah Craft (Mother) appeals the trial court's order granting Hollie Worthington's (Grandmother) petition for emergency guardianship of Mother's infant, L.B. Mother raises two arguments in this interlocutory appeal: (1) the trial court did not have jurisdiction to consider Grandmother's petition; and (2) even if the trial court had jurisdiction, the evidence does not support the trial court's order making Grandmother L.B.'s guardian. We find no jurisdictional error and sufficient evidence; therefore, we affirm and remand for further proceedings.

## Facts

L.B., Mother's only child, was born in Florida in August 2015. At that time, Mother and L.B. lived with the child's father, Brad Bristow. Bristow was extremely controlling and refused to permit Mother to maintain any relationship with Grandmother (who lives in Indiana) or with Kimberly Cain (who lives in Ohio), Mother's sister.

On December 26, 2015, Mother called Cain and told her that Bristow had beaten her up. Mother asked Cain to come and get her and four-month-old L.B. to take them to safety. This had happened before, when Mother was in high school and pregnant with L.B. At that time, Mother called Cain and told her that Bristow had beaten her up and she needed to be picked up from school. Mother stayed with Cain until Bristow was released from jail, at which time Mother returned to Bristow, moving from Ohio to Florida.

[4]     In December 2015, after receiving Mother's call, Cain and her husband drove from Ohio to Florida to retrieve them. Upon arrival, they met Mother and L.B. at a gas station. Cain noticed that the baby had an "awful smell" and her car seat also smelled and was moldy. Tr. p. 78. They returned to Mother's home to retrieve some of L.B.'s belongings. Cain entered the residence and found "cigarette butts all over the place, [and] the carpet was black," and it was the "nastiest house I've ever smelled, been in in my whole entire life." *Id.* They left the residence and drove to a gas station, where Cain vomited because the condition of the home and the infant were so awful. Next, they went to a hotel, where Cain bathed the baby and put her in fresh, clean clothing that Cain had brought. When bathing the baby, Cain noticed that L.B. had yeast growing in her armpit. Before they drove back to Ohio, Cain and her husband purchased a new car seat for L.B. because her original one was moldy and had a foul smell. Cain also noticed that the baby appeared very hungry and malnourished.

[5]     On the drive back to Ohio, Mother asked Cain to use her cell phone to text a friend. In those text messages, Mother told her friend that she had "snort[ed] some pain pills" and "smoked weed" with Bristow. Appellee's App. p. 12. Once Mother and L.B. arrived in Ohio, Mother handed over the primary caregiving responsibilities to Cain. Mother spent most of her time texting, skyping, or talking with friends.

[6]     At some point, Grandmother drove to Cain's house in Ohio. Grandmother observed that L.B. appeared underweight, but Mother complained to Grandmother that Cain had been "feeding her way too much," meaning that

Cain had been feeding the infant "every three hours." Tr. p. 94. Mother told Grandmother that she and Bristow had only fed L.B. "two bottles at one setting, and then she wouldn't eat for the rest of the day." *Id.* at 94-95.

[7] In early January, Mother and L.B. moved to Indiana to live with Grandmother. At some point, Mother and Grandmother fought after Grandmother shut off the Wi-Fi, because Mother could no longer contact her friends with her phone. Mother became furious and moved in with a man named Raymond Purvis, who lived near Grandmother. In the bedroom where Mother and L.B. were staying, there was a pile of cigarette butts on the bed near L.B.'s pack 'n play.

[8] On January 10, 2016, Grandmother's husband called the police and stated that Mother had threatened suicide; therefore, an emergency detention order (EDO) was issued and Mother had to report to a mental health facility for an evaluation. The psychiatrist who evaluated Mother did not find any imminent issues and released her from the emergency detention. Mother has been diagnosed with bipolar disorder in the past. She no longer takes her medication because she does not believe she needs it. *Id.* at 74. Specifically, Mother testified that she took medication "for maybe not even a week" in the past but that "I didn't like it, I felt like a zombie on that medicine, um, so I just stopped taking it and I haven't had the need to have it since." *Id.* at 126.

[9] On January 12, 2016, Grandmother filed a petition to be appointed L.B.'s guardian, and on January 19, Grandmother amended the petition to reflect that

it was an emergency petition. The trial court held an emergency hearing on January 20, 2016.

[10] At the hearing, it was revealed that the Department of Child Services (DCS) had stepped in to investigate allegations of child abuse or neglect with respect to L.B. Although DCS's investigation was still open at the time of the hearing, the DCS assessment worker testified that Mother had the minimal things needed for a child and that the residence where she was staying was minimally safe.

[11] L.B.'s guardian ad litem (GAL) also testified. The GAL testified that she had significant concerns about Purvis's home, where Mother and L.B. had been staying. She had observed a "huge" ashtray with many cigarette butts in it on the bed next to L.B.'s pack 'n play. Tr. p. 16. Additionally, the GAL was concerned about Purvis's two dogs, which generally roamed free around the house during the day. The GAL also had concerns based on Mother's history and became suspicious when Mother answered a phone call, "Hey, baby," in the GAL's presence. *Id.* at 20. Specifically, the GAL was worried that Mother had reestablished contact with Bristow. Mother told the GAL that it had been someone named Caleb. Additionally, the GAL was concerned that Mother is diagnosed with bipolar disorder but is no longer taking any medication for the condition. In the end, the GAL opined that it was in L.B.'s best interest to grant Grandmother's petition for guardianship.

[12] Grandmother testified, explaining that Mother has been diagnosed with bipolar disorder and borderline personality disorder. Although Grandmother has

observed Mother's behavior improve while on medication, she testified that Mother usually stops taking the medication within a couple of days. Furthermore, Mother has had inpatient treatment at mental health facilities in the past. Grandmother testified that Mother has fled Bristow's abuse in the past but has always returned to him. She also stated that at the time of the hearing, Mother was attempting to get the no contact order dropped so that she could move back to Florida with L.B. and reunite with Bristow. Grandmother explained that she is not trying to take L.B. away from her mother, but merely wants to ensure that L.B. is safe and well cared for and that Mother gets the mental help—including medication and therapy—that she needs.

[13] On January 20, 2016, the trial court granted Grandmother's emergency petition and named her to be L.B.'s temporary guardian. The court explained that it found Cain to be "extremely credible" and Grandmother to be "exceptionally credible[.]" Tr. p. 143. Among other things, the trial court found and held as follows:

> 5. The Court finds the testimony of [Cain] and Grandmother to be highly credible, and far more reliable than the testimony of both parents.

> 6. [L.B.'s] Mother is currently incapable of or unwilling to ensure the safety and daily care of [L.B.] Mother is without her own home, and is staying with an acquaintance about whom she appears to know very little. The acquaintance has a pitbull who runs loose in the home, and Mother had a large amount of cigarettes in an ashtray near [L.B.'s] bed. Mother is without employment or any source of income with which to provide for her own

or [L.B.'s] daily needs. Mother has no transportation. Mother has snorted pills and used marijuana in the recent past. Mother has previously been diagnosed with bipolar disorder and has a history of mental health issues. At the young age of nineteen years, Mother has established a history of frequent moves, several of which have been interstate. The moves have primarily centered around Mother's relationships with different boyfriends. Mother has established a pattern of immature decision-making, and poor judgment. . . . Ms. Cain observed Mother's and [L.B.'s] home [in Florida] to be in deplorable living condition. [L.B.] appeared malnourished, filthy, and had a yeast infection in her underarm area. [L.B.'s] car seat and other linens were soiled and moldy, and [L.B.] had on little clothing. . . . Since [L.B.] and Mother had been staying with Grandmother, [L.B.] has gained weight. Both Ms. Cain and Grandmother have provided care for [L.B.] since December 26, 2015, and both have observed that Mother chooses not to act as primary caregiver for [L.B.], instead relying on Ms. Cain and Grandmother to bathe [L.B.], feed [L.B.] and get up in the middle of the night with [L.B.] Mother continues to be preoccupied with her social relationships, instead of ensuring that [L.B.'s] needs are met.

7.  [L.B.] is only five months of age. Because she is a child of very tender years, it is imperative that she have a caregiver who is willing and able to constantly meet her daily needs.

[14]   Appellant's App. p. 52-54. Mother now brings this interlocutory appeal.[1]

---

[1] The trial court originally scheduled a permanent guardianship hearing but has stayed that hearing pending the outcome of this appeal.

# Discussion and Decision

## I. Jurisdiction

[15] Mother argues that the trial court did not have jurisdiction to hear and rule on Grandmother's petition, contending that she and L.B. have always resided in Florida and, as such, only a Florida court may issue a custody ruling with respect to L.B. Jurisdiction is comprised of three elements: (1) jurisdiction of the subject matter; (2) jurisdiction of the person; and (3) jurisdiction of the particular case. *In re Custody of A.N.W.*, 798 N.E.2d 556, 560 (Ind. Ct. App. 2003). Subject matter jurisdiction is not subject to waiver, but the other two types of jurisdictional arguments may be waived. *Id.*

[16] Jurisdiction in this case is governed by the Uniform Child Custody Jurisdiction Act (UCCJA).[2] *See In re Guardianship of A.L.C.*, 902 N.E.2d 343, 350 (Ind. Ct. App. 2009) (noting that a guardianship proceeding is essentially a child custody proceeding, which requires the trial court to consider child custody statutes and case law in addition to the guardianship statutes). Our Supreme Court has held that "[t]he jurisdictional limitations imposed by the UCCJA are not equivalent to declarations of subject matter, but rather are refinements of the ancillary capacity of a trial court to exercise authority over a particular case." *Williams v.*

---

[2] Ind. Code art. 31-21.

*Williams*, 555 N.E.2d 142, 145 (Ind. 1990). In the case before us, therefore, we must consider whether the trial court had jurisdiction of the particular case.

[17] At no point before, during, or after the guardianship hearing did Mother question or raise an objection regarding the trial court's jurisdiction. Instead, this appeal is the first time she has raised the issue. Challenges to a court's jurisdiction over the particular case must be raised at the first opportunity to avoid waiver. *A.N.W.*, 798 N.E.2d at 561. Here, because Mother failed to challenge jurisdiction below, she has waived it for the purposes of this appeal.

[18] Waiver notwithstanding, we will address the merits of her jurisdictional claim. The UCCJA provides, in relevant part, that an Indiana court has temporary emergency jurisdiction over the case if the child is present in Indiana and it is necessary in an emergency to protect the child because the child is subjected to or threatened with mistreatment or abuse. Ind. Code § 31-21-5-4(a). In other words, to exercise jurisdiction over the particular case under this statute, the trial court must make the following factual findings: (1) the child is present in Indiana; (2) the child is being subjected to or threatened with mistreatment or abuse; and (3) the exercise of the trial court's jurisdiction is necessary to protect the child.

[19] It is undisputed that L.B. was present in Indiana at the time Grandmother filed the petition and at the time of the hearing. As for the latter two elements, the following evidence was presented at the hearing:

- Mother is homeless and unemployed with no source of income or transportation. She and L.B. are currently staying with an acquaintance whom Mother does not appear to know well.
- When Cain retrieved Mother and L.B. from Florida a few weeks before the hearing, the condition of the infant and the home were appalling. The smell was so foul that it caused Cain to vomit. L.B. was filthy and had a yeast infection in her armpit. Her clothing and her car seat were moldy and smelled horrible.
- L.B. appeared to be malnourished and Mother told Grandmother that she had been feeding her four-month-old baby only once per day.
- Since Mother and L.B. came to Ohio and Indiana, Mother had not been acting as the baby's primary caregiver. Instead, Cain and Grandmother provided for all of L.B.'s needs, including bathing, feeding, and middle-of-the-night care.
- Mother has been diagnosed with bipolar disorder but chooses not to take her medication because she does not like how the medication makes her feel. She has recently snorted pills and smoked marijuana.

We find, based on these facts, that (if Mother had raised the issue) the trial court would have been reasonable to conclude that L.B. was being subjected to mistreatment and that the exercise of jurisdiction over the case was necessary to protect her.[3] Therefore, we find no error in the trial court's exercise of jurisdiction over this case.

# II. Sufficiency

[20] Next, Mother argues that even if the trial court properly exercised jurisdiction in this case, there is insufficient evidence supporting its order granting

---

[3] The trial court did find that "an emergency exists" and that L.B.'s "welfare requires immediate action," which we infer were findings intended to meet the jurisdictional elements set forth in Indiana Code section 31-21-5-4(a). Appellant's App. p. 53.

temporary guardianship of L.B. to Grandmother. Indiana Code section 29-3-2-4(a) provides generally that all findings and orders entered in a guardianship proceeding "shall be in the discretion of the court[.]" We will reverse only if the trial court's decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. *In re Guardianship of N.R.*, 26 N.E.3d 97, 100 (Ind. Ct. App. 2015), *aff'd on reh'g*, 30 N.E.3d 783 (Ind. Ct. App. 2015).

[21] Our Supreme Court has recognized "the important and strong presumption that [a] child's best interests are ordinarily served by placement in the custody of the natural parent." *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002). To overcome this presumption and place the child with someone other than a natural parent, "a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement. The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child." *Id.* Our Supreme Court explained the trial court's decision-making process as follows:

> In a proceeding to determine whether to place a child with a person other than the natural parent, evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would of course be important, but the trial court is not limited to these criteria. The issue is not merely the "fault" of the natural parent. Rather, it is *whether the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by*

*placement with another person.* This determination falls within the sound discretion of our trial courts, and their judgments must be afforded deferential review. A generalized finding that a placement other than with the natural parent is in a child's best interests, however, will not be adequate to support such determination, and detailed and specific findings are required.

*Id.* (emphasis added). In reviewing the trial court's determination, we will consider only the evidence favorable to the trial court's judgment. *Id.* at 288. "A challenger thus labors under a heavy burden, and must show that the trial court's findings are clearly erroneous." *Id.* Additionally,

in reviewing a judgment requiring proof by clear and convincing evidence, an appellate court may not impose its own view as to whether the evidence is clear and convincing but must determine, by considering only the probative evidence and reasonable inferences supporting the judgment and without weighing evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence.

*Id.*

[22] In this case, the probative evidence in the record that is favorable to the trial court's order is as follows:

- Less than a month before the guardianship hearing, Cain retrieved L.B. and Mother from Florida. The infant "reeked an awful smell" and her car seat also smelled bad and "had mold on it[.]" Tr. p. 78. In their residence, "there were cigarette butts all over the place, the carpet was black, nastiest house I've ever smelled, been in in my whole entire life." *Id.* Cain vomited as a result of the smell. L.B. had yeast growing in her armpit and appeared "like she hadn't eaten[.]" *Id.* at 79. Cain said that

"it was the most awful, horrific thing I've ever seen in my whole entire life, I didn't know what to even do at that point." *Id.*

- Mother left Florida because she was fleeing from an abusive relationship with L.B.'s father. He has physically abused her in the past, while she was pregnant with L.B., and she dropped the criminal charges, returned to him, and moved out of state with him. Grandmother learned that Mother has been trying to drop the no contact order that is in place as a result of the most recent abuse.

- Since relocating to Ohio and then Indiana, Mother has spent the majority of her time interacting with peers and has not been an active parent of her infant. Instead, Cain and Grandmother have been the baby's primary caregivers.

- When Mother was living in Florida with Bristow, she snorted pain pills and smoked marijuana.

- Mother has been diagnosed with bipolar disorder and borderline personality disorder. She no longer takes her medication because she does not believe she needs it. Tr. p. 74. Specifically, Mother testified that she took medication "for maybe not even a week" in the past but that "I didn't like it, I felt like a zombie on that medicine, um, so I just stopped taking it and I haven't had the need to have it since." *Id.* at 126.

- When Grandmother drove to Ohio to retrieve Mother and L.B. from Cain's home, she observed that L.B. appeared underweight. Mother complained to Grandmother that Cain had been "feeding her way too much," meaning that Cain had been feeding the infant "every three hours." Tr. p. 94. Mother told Grandmother that she and Bristow had only fed L.B. "two bottles at one setting, and then she wouldn't eat for the rest of the day." *Id.* at 94-95.

- Mother and Grandmother fought when Grandmother turned off the house Wi-Fi, meaning that Mother could no longer contact her friends with her phone. Mother and L.B. then moved out of Grandmother's home, moving in with an acquaintance whom Mother did not know especially well. The GAL's concerns about this home included dogs roaming around and a large ashtray filled with cigarette butts on the bed next to L.B.'s pack 'n play.

The trial court explicitly noted that it found both Grandmother and Cain to be extremely credible witnesses and that it found Mother to be a less credible witness. Based on all of this evidence, as well as its assessment of the witnesses, the trial court made detailed findings supporting its ultimate decision to appoint Grandmother as L.B.'s guardian. We conclude that, based on the probative evidence and inferences supporting the order, a reasonable factfinder could conclude that the judgment was supported by clear and convincing evidence. Therefore, we affirm.

[23] We note, as did Grandmother, that a guardianship need not last forever and that it is not a "punishment" of Mother. Instead, the trial court found that, for now, L.B.'s best interests are served by the guardianship. In this way, the child will be kept safe and secure, and Mother will have the time she needs to address her struggles and get back on her feet.

[24] The judgment of the trial court is affirmed and remanded for further proceedings.

Vaidik, C.J., and Najam, J., concur.